IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| John Noel Turner, | ) | C/A No.: 1:11-957-MBS-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

        On August 27, 2008, Plaintiff filed applications for DIB and SSI under the Social Security Act ("the Act"), 42 U.S.C. §§ 401–433, 1381–1383c. Tr. at 95–105. In his

applications, he alleged his disability began on January 1, 2007. Tr. at 95. His applications were denied initially and upon reconsideration. Tr. at 68, 74. On January 22, 2010, Plaintiff had a hearing before an Administrative Law Judge ("ALJ"). Tr. at 17–51. At the hearing, Plaintiff amended his alleged disability onset date to August 27, 2004 and the ALJ granted Plaintiff's motion to re-open a DIB application that he filed on February 8, 2005. Tr. at 21, 87–92. The ALJ issued an unfavorable decision on May 24, 2010, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 9–16. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 19, 2011. [Entry #1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 36 years old when he alleges his disability began. Tr. at 95. He has a high school education and completed two years of college. Tr. at 23. His past relevant work ("PRW") was as a machine operator, salesperson, loan originator, and distributor. Tr. at 14.

2.     Medical History

On August 5, 2004, Kenneth Wells, M.D., evaluated Plaintiff who showed up unannounced "somewhat manic with some religious and grandiose delusions." Tr. at 232. Plaintiff reported stopping his medications six months or more previously. *Id.*

Plaintiff felt that God had divinely intervened in stopping his medications, but Dr. Wells noted the decision may have been financial. *Id.* Dr. Wells stated that Plaintiff "appears with impaired reality testing and manic type mood." *Id.* Dr. Wells restarted Plaintiff on Depakote and Risperdal daily. *Id.* Plaintiff refused hospitalization and Dr. Wells provided Plaintiff with a 30-day medical leave. *Id.*

On August 10, 2004, Dr. Wells stated that Plaintiff was improved and appeared "quieter and less manicky." *Id.* Dr. Wells noted there were no problems with Plaintiff's medications and indicated he would allow Plaintiff to return to work on August 16th. *Id.*

On August 27, 2004, David Hicklin, M.D. treated Plaintiff for muscle spasms in his neck. Tr. at 206. Plaintiff also complained of fatigue, chest wall discomfort, and a feeling of being "run down." *Id.* He expressed concern as to whether or not his prescription of Risperdal was causing his muscle spasms. *Id.* Dr. Hicklin added Flexeril and ordered testing. *Id.*

Dr. Wells reported on August 31, 2004 that Plaintiff appeared calmer and nothing suggested any distortion to his thought or perception. Tr. at 232. Dr. Wells noted Plaintiff had returned to work. *Id.* Dr. Wells reduced Plaintiff's prescription of Risperdal to half a milligram due to side effects. *Id.*

On October 4, 2004, Dr. Wells indicated that Plaintiff was not working and had not taken his medication "in the last few days and he feels much better." Tr. at 231. Dr. Wells started Plaintiff on Lamictal as an alternative to Depakote and Risperdal. *Id.*

On January 14, 2005, Plaintiff was treated in the emergency room for auditory hallucinations. Tr. at 218. He reported being off his medications for five months and restarting his medications with no improvement in his symptoms. *Id.* He was diagnosed with acute schizophrenia, given a prescription for lorazepam, and advised to seek follow-up treatment. Tr. at 09–210, 219.

Dr. Wells next saw Plaintiff on January 17, 2005. Tr. at 231. Plaintiff reported he had stopped taking his medication a few months before and had slipped into a "somewhat disorganized anxious hyper but depressed phase." *Id.* Dr. Wells stated, "I talked with the patient and wife about the necessity for him to maintain consistency with his medications and that he functions quite well when he takes them. In fact so well that he tends to think that he does not need them further." *Id.* Dr. Wells renewed Plaintiff's prescriptions for Depakote and Risperdal. *Id.*

On January 31, 2005, Dr. Wells noted that Plaintiff had markedly improved and his symptoms had cleared. *Id.* He discussed the importance of Plaintiff being consistent with his medications and possibly trying to find less stressful and more regular work. *Id.*

On February 28, 2005, Dr. Wells noted that Plaintiff remained improved, but Plaintiff stated that "he may have overstated his improvement last time." Tr. at 234. Dr. Wells stated that Plaintiff's fatigue may be resulting from Risperdal and he prescribed a regimen to switch Plaintiff's Risperdal to Abilify. *Id.*

Dr. Wells noted that Plaintiff was doing well on March 31, 2005. Tr. at 235. Plaintiff continued to complain of a bit of fatigue, but felt the Abilify was effective and

his fatigue was nothing along the lines of what it was with Risperdal. *Id.* At a visit on April 27, 2005, Dr. Wells reported that a lower dose of Abilify was working well and Plaintiff felt he was "continuing to progress." *Id.*

On May 25, 2005, Dr. Wells indicated that Plaintiff was very sad over his mother's diagnosis of cancer. *Id.* Plaintiff continued to complain of a little bit of fatigue. *Id.* Dr. Wells continued Plaintiff's current medical regimen. *Id.*

Dr. Wells noted on June 21, 2005 that Plaintiff still had stress related to his mother. *Id.* Plaintiff complained of fatigue and sleeping problems. *Id.* Dr. Wells reduced Plaintiff's Abilify and added Zoloft to his medications. *Id.*

Dr. Wells completed a letter dated June 22, 2005 at the request of the administration indicating that Plaintiff's mental status showed a worried and anxious mood and affect. Tr. at 237. He noted that Plaintiff's thought process was intact, his thought content was appropriate, his attention/concentration was adequate, and his memory was good. *Id.* Dr. Wells indicated that Plaintiff was dealing with the death of his mother, although he would not "anticipate decompensation with usual life/job stress." *Id.*

A Psychiatric Review Technique form was completed by consultant Debra Price on August 9, 2005. Tr. at 243. Dr. Price indicated that Plaintiff had medically-determinable psychotic disorder causing mild restriction of daily activities, mild difficulty in maintaining social functioning, and moderate difficulty in maintaining concentration, persistence, and pace. Tr. at 245, 253. She found no episodes of

decompensation. Tr. at 253. She concluded that Plaintiff's mental impairment did not satisfy the diagnostic criteria for schizophrenia, paranoia, and other psychotic disorders and that his treating physician had not provided a diagnosis. Tr. at 245.

Dr. Price also completed a Mental Residual Functional Capacity ("RFC") Assessment on August 9, 2005 finding Plaintiff "moderately" limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Tr. at 239. All other abilities were marked as "not significantly limited." *Id.* Dr. Price noted Plaintiff was capable of understanding simple and complex instructions, could carry out simple and more complex tasks for two hours at a time without special supervision, and would not have an unacceptable number of work absences due to psychiatric symptoms. *Id.* Dr. Price stated Plaintiff's allegations were credible and supported by the medical evidence of record. *Id.* Dr. Price concluded, "While his symptoms are severe, they would not preclude him from carrying out basic work functions." *Id.*

On July 20, 2005, Dr. Wells noted that Plaintiff was sad, having lost his mother several weeks prior. *Id.* Plaintiff continued to complain of fatigue, but indicated that he was sleeping well at night. *Id.* Plaintiff had not yet started Zoloft and his wife expressed concerns over Zoloft's side effects. *Id.* Dr. Wells suggested that Plaintiff be "working both for his self-esteem and to fill time." *Id.* Plaintiff indicated that he was working with his wife. *Id.* Dr. Wells noted he felt much of the clinical picture was related to grief and possibly some medication-related fatigue. *Id.*

On January 1, 2006, Dr. Wells evaluated Plaintiff, who reported he was doing pretty well. Tr. at 263. Plaintiff stated he was working part-time for a mortgage company and part-time with his wife's business. *Id.* Plaintiff did not note any return of depression or any perceptional distortion and reported no real side effects with medications. *Id.* Dr. Wells observed that Plaintiff seemed relaxed and very pleasant during the interview. *Id.* Dr. Wells continued to prescribe Depakote and Abilify. *Id.*

On March 8, 2006 Dr. Wells noted that Plaintiff was no longer working for the mortgage company, but rather was working full-time with his wife's business. *Id.* Plaintiff did not report any mood swings, depression, or problems with sleep. *Id.* Dr. Wells stated Plaintiff appeared to be responding quite well to treatment. *Id.* Plaintiff continued doing well on June 26, 2006 and was still working with his wife. *Id.*

Dr. Wells noted on August 30, 2006 that Plaintiff seemed to be in a good mood and had taken a job managing a warehouse. Tr. at 262. Dr. Wells noted that Plaintiff was not showing any evidence of mania or depression. *Id.* At a subsequent visit on November 29, 2006, Dr. Wells noted that Plaintiff was doing well, working at Dollar General, and also pursuing a family business. *Id.* Plaintiff did not report any problems with mood swings or paranoia and he appeared pleasant and relaxed. *Id.* Plaintiff was continued on Depakote and Abilify. *Id.*

On February 26, 2008, Plaintiff saw Dr. Wells and reported working hard, being under stress, and having difficulty sleeping. Tr. at 261. Plaintiff also reported sleeping better after taking some time off. *Id.* Plaintiff stated he was doing "extremely well" and

that his family business was going well. *Id.* Plaintiff reported using Melatonin on a regular basis and stated that it worked well for him. *Id.* Dr. Wells also prescribed Restoril (used to treat insomnia). *Id.*

Plaintiff was treated in the emergency room on May 10, 2008 for hallucinations and insomnia. Tr. at 269. Plaintiff reported being off of Depakote and Abilify for one month and reported Dr. Wells discontinued his medications at his last visit because he was doing so well. *Id.* It was noted that Plaintiff was "somewhat hyperverbal with religious preoccupation." Tr. at 269. After receiving medication to help with insomnia, Plaintiff was released with directions to restart Abilify and Depakote and see Dr. Wells in follow-up. *Id.*

Plaintiff was treated in the emergency room on July 7, 2008 for poor focus, racing thoughts, and poor sleep. Tr. at 275. He said he had been off his medications for six months. *Id.* Plaintiff reported that his functioning had improved, but stated that he "typically decompensates with increasing stressors." *Id.* He reported having left his wife and moving in with his father. Tr. at 300. Plaintiff was admitted for treatment and educated about the need for compliance with medications. Tr. at 275. He improved slowly in terms of thoughts processes and overall mood and was discharged on July 14, 2008. *Id.* As of discharge, Plaintiff's mood, sleep, energy, and appetite were stable and he was tolerating his medications, including Depakote, without side effects. *Id.*

Plaintiff had an initial clinical assessment at Spartanburg Area Mental Health ("SAMH") on July 24, 2008. Tr. at 311. It was noted that Plaintiff had been diagnosed

with bipolar disorder at age 18 and had been treated by Dr. Wells since that time. *Id.* During the assessment, Plaintiff reported that he was self employed and noted that his wife wanted him to check into disability. Tr. at 315–16. He stated that he bowled every Thursday night and also played pool. *Id.* Following a history and mental status examination Plaintiff was diagnosed with bipolar disorder, most recent episode manic, and was given a GAF score of 60. Tr. at 318

On August 14, 2008, Eric Winter, M.D. of SAMH, evaluated Plaintiff. Plaintiff was noted as being married and his wife accompanied him to the visit. Tr. at 309. Plaintiff reported his main problem was that "he does not sleep at night and then he is chronically tired during the day." *Id.* Dr. Winter indicated that Plaintiff's affect was mildly anxious. *Id.* While Plaintiff reported difficulty with episodes of poor focus, Dr. Winter noted that Plaintiff was able to focus and his concentration was fair. *Id.* Dr. Winter's impression was bipolar disorder type 1 under fair control currently. Tr. at 310. Dr. Winter continued Depakote, restarted Abilify, and added Clonidine as a sleep aid. *Id.*

On November 11, 2008, James N. Ruffing, Psy.D. performed a psychological examination of Plaintiff at the request of the disability office. Tr. at 320. Plaintiff reported difficulty sleeping and resulting difficulty focusing. *Id.* He stated he had been having nervous breakdowns since the age of 18. *Id.* Plaintiff reported he is able to drive, care for his personal needs, attend weekly church services, go to the store, cook, clean, and do laundry. Tr. at 321. Dr. Ruffing noted that Plaintiff demonstrated a generally appropriate affect of normal range and intensity and that the mental status exam showed

that he was alert, involved and responsive. *Id.* Plaintiff's mood was slightly nervous. Tr. at 322. He stated he was feeling somewhat nervous with the evaluation process and was feeling sleepy, but was absent of other emotional symptoms. *Id.* Dr. Ruffing's impression was history of bipolar disorder. *Id.* Dr. Ruffing opined Plaintiff was able to understand and respond to the spoken word and demonstrated good emotional stability. *Id.* Dr. Ruffing stated Plaintiff was suffering more from difficulty with tiredness, fatigue, and sleepiness. *Id.* Although Plaintiff indicated his fatigue affected his ability to focus and attend, Dr. Ruffing noted that Plaintiff seemed able to attend and focus fairly well. *Id.* Dr. Ruffing opined that Plaintiff was likely to decompensate under increasing stress while struggling to manage the concentration, persistence, and pace required in a typical work environment. *Id.* The consultant further noted that particularly during periods of manic episodes, Plaintiff would have difficulty of being gainfully employed. *Id.* Dr. Ruffing stated that Plaintiff appeared capable of managing his finances if awarded benefits. *Id.*

On November 13, 2008, Dr. Winter noted that Plaintiff was doing well on Abilify and Depakote, but continued to have some difficulty falling asleep and complaints of weight gain. Tr. at 353. Dr. Winter ordered laboratory testing and continued Plaintiff's current medications. *Id.*

A second Psychiatric Review Technique form was completed by consultant Gary Calhoun on November 20, 2008. Tr. at 325. Dr. Calhoun noted the same limitations identified by Dr. Price. Tr. at 335. Dr. Calhoun also completed a Mental RFC

Assessment concluding, "Overall, claimant's symptoms and impairments are severe but would not preclude the performance of simple, repetitive work tasks in a setting that does not require on-going interaction with the public." Tr. at 341.

On December 30, 2008, consultant Gordon Early, M.D. performed a physical examination of Plaintiff. Tr. at 343. Dr. Early noted that Plaintiff was primarily applying for disability due to bipolar disorder. *Id.* Plaintiff indicated he could no longer afford to see Dr. Wells and had been following up with Mental Health. *Id.* Dr. Early stated that Plaintiff has had back pain since his workers' compensation injury approximately 15 years earlier, becoming a daily problem over the last one to two years. *Id.* Following physical examination, Dr. Early stated Plaintiff's main impairment was bipolar disorder. Tr. at 344. Dr. Early noted that Plaintiff had been doing pretty, but noted that sporadic flare ups were a problem for his employment status. *Id.* Dr. Early stated Plaintiff's sporadic back pain was most consistent with musculoskeletal back pain and noted he is not a candidate for heavy work. Tr. at 345.

On February 26, 2009, Dr. Winter evaluated Plaintiff and stated he was not surprised Plaintiff had been turned down for disability. Tr. at 352. Dr. Winter noted Plaintiff had a very even, full range of affect and a high level of insight and judgment. *Id.* Dr. Winter further noted that Plaintiff seems to be above average in his intellectual functioning and indicated that he mentioned this because Plaintiff gets surprisingly ill and psychotic and that would be difficult to predict from the mental status examination. *Id.* Because of concern about weight gain caused by his medication, Dr. Winter reluctantly

discontinued Depakote and started Plaintiff on Topamax. *Id.* Plaintiff was meeting his goals of being compliant with his medication and continuing to take care of himself at home. *Id.*

On May 6, 2009, Plaintiff had run out of medication and SAMH provided him with samples of Abilify and Topomax. Tr. at 362. Plaintiff reported irritability, mood lability, and problems acting out. *Id.*

On May 21, 2009, Plaintiff's medication management form from SAMH indicated Plaintiff complained of being sedated and forgetful due to medications. Tr. at 361. On May 26, 2009, it was noted that Plaintiff was off of Depakote and taking the full dose of Topomax. Tr. at 360. Plaintiff's active symptom was irritability and his reported side effect was being overly sedated. Plaintiff reported that he no longer needed a sleeping tablet and had stopped taking Restoril. *Id.* Records from SAMH show medication logs of 15 additional dates between August 4, 2008 and October 23, 2009. Tr. at 358, 359, 363, 364, and 391.

Consultant Robbie Ronin completed a third Psychiatric Review Technique Questionnaire and Mental RFC Assessment on July 13, 2009. Tr. at 369–82, 383–86. Dr. Ronin's findings were essentially the same as those from Drs. Price and Calhoun. *Id.*

On September 18, 2009, Dr. Winter indicated that Plaintiff's bipolar disorder condition was severe with specifiers of manic episodes and psychosis. Tr. at 393. Dr. Winter opined that Plaintiff could not be reasonably expected to retain a job at present. *Id.* The doctor further stated that even if Plaintiff's symptoms could be controlled, it is

unlikely he will become employable.  *Id.*  Dr. Winter noted, however, that he could not "predict the future."  *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing, Plaintiff testified that his most severe impairment precluding him from working was his "lack of ability of maintaining concentration."  Tr. at 23.  He testified that his trouble with concentration comes from his bipolar disorder and depression.  Tr. at 23–24.  He testified he takes medications that help him.  Tr. at 24, 31. He stated he also has difficulty staying awake and focused.  Tr. at 32.  He testified he saw a psychiatrist about every three months, but could not recall whether his doctor had advised him of any limitations he had resulting from his condition.  Tr. at 24–26.

Plaintiff testified that his ability to follow simple instructions is good, that he can follow an ordinary routine without someone supervising him, and that he does not have difficulty being around people.  Tr. at 32.  He has a driver's license and drives his daughter to school.  Tr. at 33.  He also does household chores, goes to church, and gets out for social activities.  *Id.*

Plaintiff stated he experiences back pain if he is repetitively bending or stooping, but not while sitting or lifting objects weighing 10 or 15 pounds.  Tr. at 39.

b.     Plaintiff's Wife's Testimony

13

Plaintiff's wife testified at the hearing that she had been married to Plaintiff for sixteen years and that, although he had always had mental problems, his problems had gotten worse in more recent years. Tr. at 45. She stated that he sleeps "exorbitant amounts of time," some days as much as 16 hours. *Id.* Plaintiff's wife testified that Plaintiff has difficulty with his memory, including difficulty remembering simple instructions. Tr. at 46. She testified his short term memory seemed worse. *Id.* She stated that Plaintiff is able to "tidy up" around the house and can do chores such as washing his own clothes and loading the dishwasher and that he does not often go out shopping by himself. Tr. at 47.

Plaintiff's wife testified that his impairment had caused difficulty in their relationship and that they had gone through some counseling. *Id.* She testified that sometimes Plaintiff has uncontrollable anger and frustration at not being able to do certain things. *Id.* She also testified that "he'll go through periods where he's manically depressed, and with the sleeping, the kind of lying around, the things of that nature. And then he'll go through periods where he is extremely – he's not even upbeat's not even the word. He has these grand ideas of, you know, being certain people or, or you know, becoming a millionaire, and just all kinds of really big thoughts, and that caused us in the past a lot of financial issues." *Id.*

Plaintiff's wife testified he was not close with his daughter because of his condition. Tr. at 48. She testified that he goes out with his friends a couple of times a month, but can no longer shoot pool or bowl. *Id.* She described trouble Plaintiff had

while employed at Dollar General with keying in numbers, following different codes, and matching up codes. *Id.* While working at Sonic, Plaintiff would lose it and could not keep up with things during a rush, which made his co-workers angry. Tr. at 49.

Plaintiff's wife stated she can tell when he is about to have a psychotic episode, which involves sleep deprivation, not eating, and hearing voices. *Id.* She said that these episodes recur often even though he is on medication. *Id.* She testified that Plaintiff's stress over things like his father and their finances impact how Plaintiff is doing and that he has good days and bad days. Tr. at 49–50. She recalled that Plaintiff was having more of his episodes during the period in 2006 and 2007 when he was trying to work. Tr. at 50.

c.       Vocational Expert Testimony

A Vocational Expert ("VE") reviewed the record and testified at the hearing. Tr. at 36. The VE categorized Plaintiff's PRW as a machine builder or tire builder as medium, semiskilled work; as an advertising sales person as light, semiskilled work; as a loan originator as sedentary, semiskilled work; and as a hand packager as medium, unskilled work. Tr. at 38. The ALJ described a hypothetical individual of Plaintiff's vocational profile with restrictions that limited the hypothetical individual to light work activity and simple, routine, and repetitive tasks of only occasional public contact. Tr. at 41. The ALJ asked whether there were any jobs in the local or several regions of the national economy that the hypothetical person could perform. *Id.* The VE testified to occupations that matched the hypothetical: small parts assembler (DOT 706.684-022),

light, unskilled, SVP 2 (12,000 jobs in South Carolina; 840,000 nationally); garment sorter (DOT 222.687-014), light, unskilled, SVP 2 (1,400 jobs in South Carolina; 98,000 nationally); and office helper (DOT 239.567-010), light, unskilled SVP 2 (2,400 jobs in South Carolina; 168,000 nationally). *Id.*

In response to questioning by Plaintiff's counsel, the VE testified that three absences or more per month renders an individual unable to maintain full-time work on a regular basis. Tr. at 42. He further stated it would be a problem if an employee's medication caused unintended little falling asleep episodes. *Id.*

### 2. The ALJ's Findings

In his May 24, 2010 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2010.
2. The claimant has not engaged in substantial gainful activity since August 27, 2004, the amended alleged onset date (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe impairments: a bipolar disorder (20 CFR 404.1520(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except limited to simple, routine, repetitive tasks, and occasional interaction with the public.
6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).
7. The claimant was born on October 20, 1967 and was 39 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not been under a disability, as defined in the Social Security Act, from January 1, 2007, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 9–16.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) The ALJ improperly discounted the opinion of Plaintiff's treating and examining physicians;

2) The ALJ failed to properly assess Plaintiff's credibility and subjective complaints;

3) The ALJ failed to acknowledge or assess the credibility of the testimony of Plaintiff's wife;

4) The ALJ posed an incomplete hypothetical to the VE.[1]

The Commissioner counters that substantial evidence supports the ALJ's findings that Plaintiff did not meet the disability requirements of the Act.

A. Legal Framework

---

[1] The undersigned has reordered Plaintiff's allegations of error for ease of analysis.

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

impairment prevents claimant from performing PRW; and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step.).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    The ALJ Did Not Properly Evaluate the Opinions of Plaintiff's Treating and Examining Physicians

Plaintiff argues the ALJ erred by giving no weight to the opinion of Dr. Winter, his treating physician. [Entry #19 at 18–21]. Plaintiff further argues the ALJ erred by failing to assess the opinion of examining physician Dr. Ruffing. *Id.* at 21–23. The Commissioner counters that the ALJ appropriately considered the opinion evidence and properly evaluated Plaintiff's residual functional capacity. [Entry #22 at 9–11].

If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. § 416.927(d)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal

picture" of a claimant's alleged disability. *See* 20 C.F.R. § 416.927(d)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001). In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

a. Dr. Winter

On August 14, 2008, Dr. Winter first evaluated Plaintiff and diagnosed him with bipolar disorder type 1 under fair control. Tr. at 310. While Plaintiff reported difficulty with episodes of poor focus, Dr. Winter noted that Plaintiff was able to focus and his concentration was fair. Tr. at 309.

On February 26, 2009, Dr. Winter evaluated Plaintiff and stated he was not surprised Plaintiff had been turned down for disability. Tr. at 352. Dr. Winter noted

Plaintiff had a very even, full range of affect and a high level of insight and judgment. *Id.* Dr. Winter further noted that Plaintiff seems to be above average in his intellectual functioning and indicated that he mentioned this because Plaintiff gets surprisingly ill and psychotic and that would be difficult to predict from the mental status examination. *Id.*

On September 18, 2009, Dr. Winter indicated that Plaintiff's bipolar disorder condition was severe with specifiers of manic episodes and psychosis. Tr. at 393. Dr. Winter opined that Plaintiff could not be reasonably expected to retain a job at present. *Id.* The doctor further stated that even if Plaintiff's symptoms could be controlled, it is unlikely he will become employable. *Id.* Dr. Winter noted, however, that he could not "predict the future." *Id.*

In his decision, the ALJ stated the following with respect to Dr. Winter's treatment records and opinions:

> [T]he undersigned notes that Dr. Winter reported on September 18, 2009 that the claimant was unable to sustain work activity due to a bipolar disorder. This statement is not supported by the record, including Dr. Winter's own treatment notes that show the claimant to have fair to good ability to concentrate and interact socially. Therefore, this opinion is given no weight.

Tr. at 14.

Plaintiff submits that Dr. Winter's opinions should have been given controlling weight because they are consistent with the record, which documents statements by numerous treaters that Plaintiff decompensates under increasing stress. [Entry #20 at 19–20]. Plaintiff also argues that even if the ALJ determined Dr. Winter's opinions should

not be given controlling weight, he erred in giving Dr. Winter's opinions "no weight." *Id.* at 21. In defense of the ALJ's decision, the Commissioner contends Dr. Winter's September 2009 opinion was not sufficiently supported by the record, including his own scant treatment notes that show Plaintiff has a fair to good ability to concentrate and interact socially. [Entry #22 at 9]. The Commissioner also selectively references Dr. Winter's February 2009 statement that he was not surprised Plaintiff had been turned down for disability. *Id.* at 10. Having considered the record evidence, the ALJ's decision, and the parties' briefs, the undersigned agrees with Plaintiff and recommends this matter be remanded for additional consideration.

The ALJ's only stated reason for according Dr. Winter's opinions no weight was that the record documents Plaintiff "to have fair to good ability to concentrate and interact socially." Tr. at 14. The ALJ did not cite to specific records in making this determination, nor did he address the long-term treatment relationship Plaintiff had with Dr. Winter or that Dr. Winter is a specialist in mental health. Significantly, the ALJ failed to address Dr. Winter's statement that despite Plaintiff's above average intellectual functioning and presentation on examination, he "gets surprisingly ill and psychotic." Tr. at 352. This statement by Dr. Winter undercuts the ALJ's reliance on Plaintiff's demonstration on examination of his abilities to concentrate and interact socially. For these reasons, the undersigned finds that the minimal explanation offered by the ALJ for assigning no weight to Dr. Winter's opinion is insufficient.

The Commissioner offers further support for the ALJ's decision by characterizing Dr. Winter's treatment notes as "scant." [Entry #22 at 9]. The ALJ did not provide this reason in his decision and this post-hoc rationalization offered by the Commissioner does not remedy the deficient analysis by the ALJ. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

Based on a review of the record, the undersigned recommends finding that the ALJ's rejection of Dr. Winter's opinions was not based on substantial evidence and reversing and remanding the case for further consideration.

b.      Dr. Ruffing

On November 11, 2008, Dr. Ruffing performed a consultative psychological examination of Plaintiff. Tr. at 320. Although Plaintiff indicated his fatigue affected his ability to focus and attend, Dr. Ruffing noted that Plaintiff seemed able to attend and focus fairly well. Tr. at 322. Dr. Ruffing opined that Plaintiff was likely to decompensate under increasing stress while struggling to manage the concentration, persistence, and pace required in a typical work environment. *Id.* The consultant further noted that particularly during periods of manic episodes, Plaintiff would have difficulty of being gainfully employed. *Id.*

The only mention of Dr. Ruffing's opinions in the ALJ's decision is as follows: "On November 11, 2008, the claimant underwent a consultative mental status evaluation,

performed by Dr. Ruffing, which revealed a history of bipolar disorder with no noted mental limitations." Tr. at 11–12.

Plaintiff argues the ALJ erred in inaccurately describing Dr. Ruffing's treatment records and failing to provide reasons for discounting Dr. Ruffing's opinions. [Entry #19 at 21–22]. Plaintiff also contends Dr. Ruffing's opinions are not inconsistent with the opinions of Plaintiff's other treating and examining physicians Drs. Winter and Early, making the only contradictory opinions those of the non-examining, agency physicians. *Id.* at 22. The Commissioner counters that Dr. Ruffing never opined that Plaintiff was not able to engage in substantial gainful activity and Dr. Ruffing observed Plaintiff with good emotional stability and the ability to attend and focus fairly well. [Entry #22 at 10–11].

The Commissioner admits that in determining Plaintiff's RFC, the ALJ relied on the opinions of non-examining, state agency physicians, Drs. Price, Calhoun, and Ronin. *Id.* at 11. "[T]he testimony of a non-examining physician can be relied upon when it is consistent with the record." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984). Here, there is doubt as to whether the non-examining physicians' opinions are consistent with the record. Dr. Ruffing, a state-agency consulting physician, expressed clear reservations regarding Plaintiff's ability to maintain employment during manic episodes. Tr. at 322. Dr. Ruffing also found that Plaintiff was likely to decompensate under increasing stress while struggling to manage the concentration, persistence, and pace required in a typical work environment. *Id.* Not only did the ALJ not adequately explain

26

the weight he accorded Dr. Ruffing's opinions, he made no mention of these opinions anywhere in his decision.

Because the ALJ did not adequately address Dr. Ruffing's opinions or explain the weight accorded to them, the undersigned recommends reversing and remanding the case for further consideration.

### 2. The ALJ Improperly Analyzed Plaintiff's Credibility and Subjective Complaints

Plaintiff next argues that the ALJ erred in failing to provide an adequate explanation for concluding Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. [Entry #19 at 26–27]. The Commissioner argues the ALJ reasonably found Plaintiff less than credible based on his history of conservative treatment, the effectiveness of medication in controlling his symptoms, and the lack of objective medical evidence of his alleged impairments. [Entry #22 at 14–15].

Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged. *See* 20 C.F.R. § 404.1529; 20 C.F.R. § 416.929; SSR 96-7p; *Craig*, 76 F.3d at 591–96 (discussing the regulation-based two-part test for evaluating pain). The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain." 76

F.3d at 594 (internal quotation omitted).  Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work."  *Id.* at 595.  This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about his pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence.  *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989).  "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, ¶ 5.  In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage,

effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process.  *See Craig,* 76 F.3d at 591–96.  The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms he alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of his symptoms was "not credible to the extent" the testimony was inconsistent with the ALJ's determination of his RFC.  Tr. at 14.

The ALJ found that the record did not support Plaintiff's allegations of a debilitating condition because it shows Plaintiff's bipolar disorder is "well controlled with medication with fair concentration and social interaction."  Tr. at 14.  The ALJ provided no other reasons for discrediting Plaintiff's credibility or subjective complaints and did not address what weight, if any, was given to Plaintiff's statements regarding the debilitating effect of his condition.  The ALJ's decision does not comport with SSR 96-7p's requiring that it provide "specific reasons for the finding on credibility, supported by the evidence in the case record" and "be sufficiently specific to make clear to the

individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. Although the ALJ is not required to discuss every piece of record evidence, he must articulate his findings in a manner that permits the court to determine whether substantial evidence supports his decision. Because he did not, the undersigned recommends that, on remand, the ALJ be instructed to more fully articulate the evidence he considered and on which he relied in making his credibility determination and, if applicable, in discounting Plaintiff's claims of debilitating fatigue and loss of focus.

The undersigned agrees with Plaintiff that the Commissioner's argument that the ALJ's credibility determination was supported by Plaintiff's history of conservative treatment and ability to engage in activities of daily living is impermissible post hoc rationalization that does not rectify the ALJ's faulty credibility analysis. *See Golembiewski*, 322 F.3d at 916.

        3.        The ALJ Erred in Not Addressing the Testimony of Plaintiff's Wife

Plaintiff argues the ALJ's failure to address the lay testimony of Plaintiff's wife, Pamela Turner, renders the court unable to determine that the ALJ's decision was based on substantial evidence. [Entry #19 at 17]. The Commissioner contends the reasons the ALJ found Plaintiff's subjective complaints were not credible also applies to lay witness testimony and any deficiency in the ALJ's evaluation of Mrs. Turner's testimony was harmless error. [Entry #22 at 12]. Given the undersigned's conclusion that the ALJ's credibility analysis was faulty, the Commissioner's argument is unpersuasive. The

undersigned recommends the ALJ be directed to specifically discuss and evaluate Mrs. Turner's testimony on remand.

### 4. The ALJ's Hypothetical to the VE was Proper

Plaintiff's last argument is that the ALJ erred at Step Five of the sequential evaluation process by presenting an incomplete hypothetical to the VE. [Entry #19 at 24]. At Step Five, the ALJ must determine whether, considering a claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1569, 404.1569(a). In this case, the ALJ posed a hypothetical to a VE to assist in making this determination. Plaintiff argues that the ALJ erred by finding at Step Three that Plaintiff had a moderate mental limitation in concentration, persistence or pace yet failing to include this finding in his hypothetical to the VE. [Entry #19 at 24].

As stated above, in making his determination at Step Five, the ALJ had to consider Plaintiff's RFC. The moderate mental limitations the ALJ found in his Step Three analysis were used to rate the severity of Plaintiff's mental impairment, which is a separate analysis from the ALJ's assessment of Plaintiff's RFC. *See* 20 C .F.R. § 416.929(a). As required by the sequential evaluation process, the ALJ appropriately incorporated his Step Three findings into his RFC determination limiting Plaintiff to "light work . . . except limited to simple, routine, repetitive tasks, and occasional interaction with the public." Tr. at 13; *see Wood v. Barnhart,* No. 05–432, 2006 WL 2583097, at * 11 (D. Del. Sept. 7, 2006) (by restricting plaintiff to jobs with simple

31

instructions, the ALJ adequately accounted for plaintiff's moderate limitation in maintaining concentration, persistence or pace).  Because the ALJ was required to use his RFC assessment, not his Step Three finding, in determining whether jobs exist in significant numbers in the national economy that Plaintiff could perform, the undersigned is not of the opinion that the hypothetical to the VE was improper.  However, the foregoing findings regarding the ALJ's analysis of the medical opinions and Plaintiff's credibility and subjective complaints may have an impact on the RFC finding.  Thus, the undersigned recommends directing the ALJ, on remand, to adequately explain his RFC finding and to reconsider whether to include additional limitations in Plaintiff's RFC based on the Step Three finding of moderate mental limitation in concentration, persistence or pace.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law.  Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence.  Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

July 25, 2012                                    Shiva V. Hodges
Columbia, South Carolina                        United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).